We have four arguments today. Judge Hughes will be participating in the decision. He's not available to be here today. He will listen to the recordings after the arguments. Our first case today is number 221719 Anchorage v. United States. Mr. Wisser. Good morning, your honors. May it please the court. The trial court erred in its plain text interpretation of the party's 2003 memorandum of understanding. This court, on de novo review, should hold that the agreement's text did not require the United States contractually to deliver a defect report structure to Anchorage. Nor would we expect it to. This is a federal project, authorized by Congress, executed by a federal procurement contract. In your opinion, what duties did Marad have under the 2003 MOU? So as far as we're concerned, your honor, Marad didn't really have any duties under the MOU. The MOU is what it says on its face. It's a government-to-government agreement whereby it sets out the party's mostly preexisting responsibilities in writing to make it clear who's doing what. The main things that it's doing, which is confirmed in Anchorage's own presentation to its municipal assembly in the ratification process, was it was providing a mechanism to transfer the local matching funds to the federal government. I keep getting stuck on, you say you don't think it had any duties? I mean, it's an agreement between two parties? Unless you use the word agreement like, I agree that the Steelers are the best team in football, that's, I mean, agreements have duties. They do have duties, your honor. The point, though, is that they're not substantive project execution duties. They're procedural. Okay, well, that's kind of important. I mean, I was sort of startled. I think maybe it was the other side's brief that said you argued there were no duties. I thought you can't possibly be saying that. No, your honor. I should have clarified. What I meant was there were no substantive project execution duties. There are duties relating to the procedures and how each government is going to respond to the movement of funds, who's going to do what in that process. There are provisions in there which provide Anchorage some authorities that they otherwise would have lacked, so the government is committing to let Anchorage authorize all expenditures on the project before they're obligated on the contract. Merit is committing itself to give Anchorage the right to inspect and accept the work through an endem two, which otherwise they would not have under a FAR procurement contract. Is there a name for this role in the world of construction? It's not the project owner. You say you're not really the builder. You're sort of a financier. Is there a name for this role? Your honor, I think it's a difficult way to frame the federal government's role here, because the federal agency is the agency Congress is tasked with executing the project, and that's a typical role that the government plays in thousands of projects nationwide every year. The government, pursuant to its congressional authority, went out, hired a procurement contractor, and entered into a contract with Anchorage in which he had some duties. Then we entered into a government-to-government MOU, which again is very common in these projects. Almost every single one that's going out into the states is going to have a local government partner that's facilitating the project in some way, oftentimes with matching funds as Anchorage did here. I think that speaks to the broad reach and the risk of the way that the trial court interpreted the MOU, which is that these kinds of arrangements happen all the time. If we're going to imply into every government-to-government MOU an implicit promise by the United States to guarantee the success of the project, that could apply to thousands of projects. The government simply doesn't take on that role. If the government is going to commit to build something contractually to a third party, it has to say so expressly in the text, and it didn't do so here. The language of, what is it? This is the 2003 MOU, section 5, number 7, maybe? Yes, Your Honor. Disperse funding for construction. Now, you all entered into an agreement with what became ICRC. That's correct, Your Honor. Which has been described as the prime contractor. Is that a label that you dispute, or do you use that label, too? No, that's a reasonable description. Was it ICRC that then entered into contracts with the firms that did the pile driving, the actual constructors? Yes, Your Honor. ICRC was a federal procurement contractor, had an IDIQ task order-based contract. The government would issue task orders to ICRC, again, concurrent with Anchorage's responsibility to authorize funding for those tasks. Then ICRC, if they could do the work in-house, they would do it. If they needed a subcontractor, they would identify a subcontractor and go forth that way. Why doesn't that put you in the position of essentially the builder that is supposed to deliver the product through ICRC? Well, again, Your Honor, if that was a role the government was volunteering to take on on behalf of a local government, it has to say so in the text, which it doesn't do. So assume with me that there is a word or two that is not clear on its face as to its scope, like perhaps the words that I pointed to, 5-7. Yes, Your Honor. Why would the ICRC-MARAD contract, described as you just did, and I think the contract itself has a section on construction services with, you know, entering and procuring things. It does, Your Honor. Why would that not be relevant to or maybe even significant to deciding on the scope of this 5-7 language? So if there is an ambiguity the court finds and perceives that the scope of the ICRC contract itself is relevant to determining the party's responsibilities under the MOU, there are a couple points there that I think undercut Anchorage's theory also. The first, Anchorage was a named third-party beneficiary under the ICRC contract. And so they were entitled to and, in fact, did seek their own contract claim for breach directly against ICRC and district court in Alaska. So, again, this is not a situation where there was perhaps one line of privity of contracts and Anchorage was sitting on the outside. Anchorage was a direct third-party beneficiary. So, again, if the court is reading all of these agreements together to resolve some ambiguity, that is persuasive evidence that this was not intended to be sort of a linear flow of contracts. Anchorage had its own right to sue ICRC for breach, and they did so. They got $19.35 million in a settlement before trial. The other piece in there is there's all sorts of language. Explain to me why Anchorage, and I'm not quite getting why, the fact that Anchorage was a third-party beneficiary to the MARAD. ICRC contract tends to undermine, I think you're suggesting, the inference that it also, under its closely related 2003 agreement with MARAD, was purchasing a defect-free doc. Right, because, Your Honor, I think the situation would be different if Anchorage did not have that ability. Then I think there might be more force to their argument that they were sort of on the outside of this chain of contracts looking in. And so they were looking to MARAD to be the entity that was essentially vindicating any rights the government might have had for breach of contract. But the fact that MARAD made Anchorage a third-party beneficiary shows that this was less of a straight line and more of a mutual relationship with the project contractor. So it's not a situation where MARAD is simply going out and procuring services on Anchorage's behalf. Anchorage is deeply involved in those services themselves. The other thing I would note, and this relates to Addendum 2 of the MOU, which is another part of the MOU that the trial court relied on. In Addendum 2, there's language in there about the process for inspecting and accepting the work. And what we find in the contract, the FAR contract with ICRC, is that MARAD modified the typical FAR clause for inspection and acceptance. And instead of the typical clause, which says the government has the right to inspect and accept all work, they inserted language that mirrors Addendum 2, which is that it's Anchorage that has the right before a certificate of completion is provided to MARAD to inspect and accept the work. So you anticipate that. I want to talk about Addendum 2. Can you just kind of walk me through that? And in particular, I want to understand, was there some work that was accepted, certified, and tendered in the process? There was, Your Honor. There was, Your Honor. And so this goes to one of our arguments later on, on the reliance damages analysis. But, yes, there was $117 million worth of work that was, in fact, completed, inspected, accepted, and title transferred to Anchorage through this process. And the scope of work that was accepted was stipulated by the party's pretrial. There's no dispute about that. And that work is- And that's usable. It's in use. It's being used by the Port, yes. That's not the defective- There are other dock structures. There's backlands areas of the Port. There's a road and rail spur. There are other elements of the overall property that was also built under the auspices of this larger project and agreement. And that was all accepted and is being used by Anchorage today. But what this addendum is providing, as I said, Your Honor, is it's essentially adding Anchorage into the process of inspecting work where otherwise, under the typical FAR clause, they would not have any rights. Again, the typical FAR clause says it's the government's responsibility to inspect and accept work provided by a contractor. What this does, and we can read it right here, right, the certificate of completion is executed by Marin's prime contractor, testing to the inspection of the work- Well, hang on. You're reading from something. Can you tell me the page? Oh, I'm sorry, Your Honor. Appendix 21681. And this is the very last page of the 2003 MOU. You can keep reading. I just wanted to make sure I could follow along. Certainly, Your Honor. And I'm looking at the second full paragraph there. And it says the certificate of completion is a document executed by Marin's prime contractor, attesting to the prime contractor's inspection of the work, certifying the work was completed according to specifications. And then if we read the next sentence, prior to submission to the Marin contracting officer technical representative, the certificate of completion shall also be signed by an authorized representative of the municipality of Anchorage. Such signature indicates acceptance by the municipality of Anchorage of the work provided by Marin's prime contractor, as specifically described in each certificate of completion. So, again, this is adding Anchorage. So your time is running low, and there are at least two topics that I at least want to get to. Certainly, Your Honor. One of them is, in the scheme of things, small, merely $11 million. So why isn't – I'm not entirely sure I understand your various arguments against that. Tell me what's wrong with the following. The way in which your expectancy, the expectancy damages was calculated, and you don't challenge that calculation here, the 356, is to take certain payments that were made to ICRC and others as an estimate of what the value would have been of a successful. That's correct, Your Honor. And that's because that's the traditional practice. So why isn't the $11.3 million that was paid to ICRC not just – not without dispute, but as a settlement, not a form of that? Your Honor, our position is it has nothing to do with the work received. Now, I want to make sure we're clear in where this lies in the sequence of arguments, right? The court would only reach this point if it affirms the trial court's interpretation of the MOU as to Merritt's breach of both the obligation to deliver a defect report and the obligation to provide cooperation with Anchorage in the settlement process. If the court reaches both of those, our argument is that the way that the trial court described the settlement damages, it described it as essentially a reliance damage, which is Anchorage provided funds to the United States in reliance on the fact that the United States would comply with what the court believed to be its obligations under the MOU. Merritt failed to do so, and so the proper remedy is to essentially put the parties back where they were status quo, refund that money to Anchorage. And our argument, Your Honor, is that that is incompatible with the expectation award. And so the second item that I was flagging, suppose for purposes of this question that we agree with you that there was no duty under the contract to deliver a defect-free report. Nevertheless, there are, I think you now agree, a bunch of duties in the memorandum of understanding. Why shouldn't we remand for those to be considered? Is it a preservation question? That is, were they independently not argued? Were there findings about those? And if there are such duties, what kinds of damages would flow? So, Your Honor, I think this The second part may be more for the other side. And I think the simplest response from our view, Your Honor, there, the straightest line path, is there was no evidence of damages presented at the trial court that could sustain an award under any other breach theory. We described in our brief how the trial court's damages opinion recited the full scope of damages evidence, which was exclusively focused from an expectation standpoint. This is all tried in one trial? It was, Your Honor. There was no damages trial against your liabilities? No, Your Honor. It was all in one trial, Your Honor. The opinions were split, but it was one trial. And so the only evidence presented was on the value of the port structure. There's other evidence that would have needed to be presented if there were more discrete expectation awards based upon a failure to manage. You would still need to do proximate cause and foreseeability analyses. We noted that in the trial court's opinion itself, it made findings about how Anchorage was involved in a lot of these decisions, which would be relevant to that analysis. But Anchorage didn't present any evidence on that. They focused exclusively on the value of the port. And so our argument, based on this court's precedence, is that they don't get a redo to present new evidence on a remand. It has to be a citation to evidence in the record. I have a follow-up on the judge's good question there. What about if we agree with you that there was no breach under what I'm going to call the 2003 MOU, which I think is what you called it. Yes, Your Honor. What about the 2011 MOA? Yes, Your Honor. Would there potentially be something where we need to remand to go back and see if there would be? No, Your Honor. The parties all agreed that the relevant actions that occurred that might have constituted a breach with respect to the construction and design work itself were all under the 2003 MOU. The 2011 MOA was only in effect for six months at the very tail end of this, from November 2011 until May 2012. And there was no substantive activity going on at that time. It was mostly inspecting, trying to figure out what went wrong in the project at that point. I'm a little confused. It's the 2011 MOA that has this duty to cooperate? It does, Your Honor. So why is that not a freestanding breach of a contract? It is. I want to be clear. The duties related to the construction and design work, any breach thereof, are exclusively under the 2003 MOU. The duty with respect to the settlement and the duty to coordinate and cooperate in claims, that's under the 2011 MOA. And so two agreements, two relevant duties, two potential breaches that the court could find, but they're separate in that respect. So assuming that we're just talking about a breach of the 2011 agreement of the duty to cooperate clause, what's wrong with the $11 million damages award for that? So our argument there is that the trial court simply misinterpreted the plain language of that clause, which says... Assume I disagree with you. If you disagree with that, then we have no other argument about the breach on that point, other than potentially the argument that the breach occurred several months after the MOA expired. Now, the trial court said it was a continuing duty. We disagree with that. That may be a separate ground. But we don't make any other arguments beyond sort of the interpretation of the scope of the duty. I see my time has more than expired here. We'll restore your rebuttal time. Thank you. Thank you. Mr. Smith. Good morning, Your Honors. If I may, I'd like to start with answering a question that Judge Toronto posed to the Government's Council, and that is, is there any kind of similar structure that the Maritime Administration would be in in the construction industry? And the answer to that is yes. And as Judge Sheffield told the Assembly, Governor Sheffield, thank you, Governor Sheffield pointed out to the Assembly during the process of the Assembly's approval of the 2003 MOU, the parties likened MARAD's role to a project management consultant. That's similar to a design-build contract or a construction manager at risk. And if you look at Appendix 169-59, where Governor Sheffield is describing what the Maritime Administration is going to do vis-à-vis this project. That's when he's lobbying the Assembly for ratification. Right. What he says is MARAD is going to serve in the role of PMC. In other words, they're going to provide their expertise, and they're going to go out, and they're going to hire the designers on behalf of the municipality. They're going to hire the contractors, and they're going to deliver to us a port expansion project. So in that role, the project management consultant, does that actor disperse funds? Yes. Does it become a contract party with the actual worker bees? Yes. Well, not necessarily. Not the individuals, but the constructing companies. It's no different, Your Honor, than if you look at the organizational chart that the Maritime— I'm sorry, the answer is yes. The answer is yes. That's a role. In which that actor would do something that included that kind of contract with a prime contractor, who then in turn has the contracts with the actual builders. That's correct, Your Honor. And it's depicted graphically in our brief. I believe it's at page 33. We reproduced for this court the organizational chart that the Maritime Administration actually put out in the public to show how it saw this project and the management of this project. And if you look at that, it shows the municipality of Anchorage, the Port of Anchorage, off to the side as the, quote, project sponsor, and Marriott in charge of the entire project and holding all of the design and construction contracts. And that's, in fact, what happened. The parties executed— So if that's an apt label for the role, does it follow that that actor in normal parlance, normal practice does, in fact, promise to deliver the end product, even though it's just a consultant? Yes. If that contractor holds the design and construction contracts, that contractor is responsible for the actions of those contractors. That's the TECON case. The TECON case from this court says that a contractor is responsible for the nonperformance of its subcontractors, and that is exactly what we have here. Just to kind of also have us doing like a talking to each other, I want to point to, or have you point to, actually, what you are thinking is most relevant to your side of the case in terms of the 2003 MOU. I would be happy to, Your Honor. If you start at Section 3 of the 2003 MOU, the very last sentence in that section says— What page are you on? I'm sorry. I'm at Appendix 21-676, which is page 1 of the 2003 MOU. And this is the objectives section? It's Section 3, correct? And if—I'll give you, Your Honor, a second to get there. Okay. Go for it. If you look at the last sentence, it says, MOA Port of Anchorage and Marriott anticipate substantial completion of port expansion will occur during calendar year 2008. And then the duties and obligations of the parties go on. And if we look at the responsibilities that the Maritime Administration undertook— Section 5 of the 2003 MOU— we have several operative provisions that establish duties on the part of the Maritime Administration. Number one, the Maritime Administration was going to provide specialized technical expertise and input as necessary to port expansion. And in exchange was going to receive 3% of contract funds, and we know that they did. In addition, they received a number of military benefits. Your Honor asked about the $117 million invoked assets. Part of that included military benefits. Those road and rails and some of the Tidewater Road, those are to establish links between Joint Base Elmendorf-Richardson, which sits right above the port. The port was designated a strategic port, and the Stryker Brigade needed an access point to get to the port so it could deploy out into the world. Then we go down, Section 3. Designate primary MARAD points of contact for day-to-day management of port expansion activities. And we know MARAD did that. Judge Damage listened to 24 witnesses and looked at a huge volume of evidence. And the testimony before Judge Damage from the contracting officer, from the contracting representative, was all the same. MARAD understood that it had an obligation to provide design, construction, and quality assurance, and it attempted to go out and do that. Wayne Leong, who was the contracting officer for the duration of the project, testified that they were responsible. MARAD was responsible for quality assurance of this project. And he testified that they hired civil engineers to be physically on site to supervise the work at a time after they learned of defects. And when asked if that should have been done earlier, he said absolutely we should have done that earlier because it was our responsibility to oversee and manage this project. As Judge Damage pointed out in his opinion, there is not one single witness of the 24 who testified over the course of this trial who disagreed that MARAD had an obligation to design and deliver a port to the municipality of Anchorage. Those are the witnesses offered by the municipality, and those are the witnesses that were offered by the government. They all said the exact same thing. How at all do you believe Addendum 2 fits into all of this? Addendum 2, so let's be clear. So Addendum 2, which is a contract document, was executed in 2006. And the contemporaneous stage of the project is important at that point because at the time the 2003 MOU was executed, a design had not been selected for this project. By 2006, the Maritime Administration had selected the preferred design for the project, the open-cell sheet pile technology, and at that point had gone through the environmental assessment process and was ready to start design and construction work. And so in 2006, the parties established this process by which title for completed work will transfer from the Maritime Administration to the municipality of Anchorage. Now if the municipality was responsible for this project, there would be no need to transfer title. And again, the Governance Council made reference to modifications to the ICRC contract to make it consistent with Addendum 2. Well, as Judge Damage found, we were not a party to that federal procurement contract. That was a contract that was held by the Maritime Administration. But the language is clear in Addendum 2. And if we look at the first paragraph, the government focuses on the second, but if we look at the first paragraph, it says that Marriott's contracting officer's technical representative will look at the work, that the work's being performed by Marriott's contractor, and that upon acceptance I'll write title and interest, including all warranties for the work shall pass to the municipality of Anchorage. And work is defined as materials, workmanship, warranties, guarantees, and manufacture and fabrication of components. And the clear import of this provision was that that work that was being procured by the Maritime Administration had to be free of material defects and conform to applicable industry standard at the time it was transferred to the municipality of Anchorage. And that simply didn't happen. Why do you think that the sentence in Addendum 2 about, upon acceptance by Marriott of work tendered, all right title and interest to such work shall be conveyed to Anchorage, indicates that there was a government promise to deliver the port, as opposed to deliver title to pieces of work that are acceptable, and then we haven't talked about this yet because I'm not quite sure why, but 90 days later Marriott can walk away from this. Yeah, and I'm happy to address that too. Let me take those two points separately. Number one, the right title and interest is in Marriott's possession because Marriott holds all of the design and construction contracts, and the work is being procured under that federal procurement contract. As the government counsel admitted during the midterm. Right, so Marriott would have title to it and then has to pass it. Why does that tend to imply that it took on the task, the obligation to finish the product successfully? Well, the object of this contract, as the parties understood, was to complete port expansion. And you have that in the 2003 MOU, and your honors asked the government about the 2011 MOA, the memorandum of agreement. Is there something about this agreement that wouldn't make sense if basically one read it to say Marriott's on board now, but three months from now it might not be? No, I don't agree with that. First of all, termination clauses are not unusual in the construction industry, and they're certainly not unusual in the government contracts field. But nothing about the termination provision suggests that it alleviated Marriott for the breach of the other duties it assumed under this contract. And we have to deal with the reality of the situation that we're operating in. The reality of that situation is, even though there's a termination clause, Maritime Administration went out and executed $300 million in designing construction contracts. And so they can't just walk away from this project. But more importantly, this whole notion about the termination clause essentially rendering this contract meaningless, that wasn't properly raised in front of the court. If you look at Judge Damage's well-reasoned decision on liability, he struck that argument because it had never been raised at any point during the seven years of litigation, and the government didn't appeal Judge Damage's decision to strike that. And so it's not properly before this court. So can I ask, I guess, a new question that was asked of the other side a little bit? Let us suppose for a minute that we thought that there was not a promise to deliver a defect-free port. There are, nevertheless, a bunch of promises that the government makes in the 2003 MOU. Where does that leave us? First of all, am I right in understanding that the Damage's case you put on was entirely about the expectancy of a fully delivered port? No. We offered alternate theories in our briefing. Judge Damage, in his Damage's decision, decided that because he had found the breach of the duty to deliver, there was no reason to consider our other alternative theories. Where does he say that? Do you remember? Is this in the breach opinion? It's in the breach opinion, Your Honor. I believe it's footnote number one, and I can provide that to you. I'm looking at it. Footnote number one of the breach opinion? I'm sorry, it's footnote seven, Your Honor. Oh, okay. I was so close. What appendix page? 39. Appendix 71. Oh, 71? Appendix 71, footnote seven. Okay, so it's the Damage's opinion, not the breach opinion. Correct. And I can read it for the Court. It says, the Court need not address Anchorage's alternative theory, Reliance Damages, in light of this opinion. And then it goes on to say, Reliance Damages allow a party to recover all damages caused by the breach, regardless of whether the damage has occurred before the breach. And I'm running short on time. I want to make sure I address your question on duties. Let us be clear. There were multiple duties assumed by the Maritime Administration. We advanced multiple theories of breach in the case below, including the breach of the only duty that the government admits it had an obligation to perform, and that is the duty to administer these contracts. Administer has to be understood in the context of federal procurement law. And under federal procurement law, when a government agency goes out and procures and administers contracts, it does so with the requirement that it gets value for the services that it is procuring. And our position is, and always has been, that MARAD was given $306 million to build this port. But even if you assume the only obligation is the obligation the government admits that it had, it had an obligation to administer those funds appropriately. I'm certainly remembering this, but tell me if I'm remembering that it has something to do with this Reliance damages. I thought the government has a presentation in which it says, you all received more money from the combination of the MARAD plus the State of Alaska contributing like $91 million or something to you. So you just don't have any positive Reliance damages to complain about. Yeah. Let me address that because that can be easily addressed. And the judge below, Judge Damage quickly addresses. There are two buckets of damages here. Bucket number one is $180 million. That is money that was provided to the Maritime Administration for design and construction work for which we got defective work that has no value. That was provided by Anchorage. That was, well, the source of funds under the Westpac case is irrelevant, Your Honor. It's money that we procured either from ourselves, our own Anchorage sources or other sources to provide to the Maritime Administration to build a port expansion. That money was for the benefit of the Maritime Administration. Would that include congressionally appropriated? Yes, absolutely. Under the Westpac case, it would 100%. In addition, we have a second bucket of damages, $186 million. Now, there is no dispute. The government's own consultant found that what was built out there is a hazard to public safety. A sinkhole could open at any point in time and kill somebody. It has to be removed. It creates navigational hazards and all kinds of other issues. The $186 million is the cost it will take to remove that structure and stabilize the site to make it safe. I remember, right, the government about that says you haven't incurred that yet so it's not reliance damages citing, I don't know, American Capital or something? They cited one of the Windstar cases, right? But the Windstar cases aren't applicable here. If you look at Indiana Power, this is obviously a total breach case. In a total breach case, we can recover all of the damages that are reasonably certain and that were foreseeable at the time. But a couple of things on the damages. I just want to remind the court, there was no testimony from the government below. We provided expert testimony on the calculation of damages, including the impairment calculation of the $180 million that was defectively performed. There was no expert, no witness that contested that calculation. Same thing with the $186 million. The government gets up here and says it's speculative, it's not been actually incurred so you can't award it. Can you specifically address the $11 million? I feel like that was where a lot of their argument was lying on the damages. Yeah, let me talk about the $11.3 million. So the $11.3 million is included in bucket one, the impairment calculation. Now, in 2010, the parties started negotiating the 2011 Memorandum of Agreement. At that time, Marriott's contractor had already asserted claims. The parties knew there were claims. And so part of the reason for entering into the 2011 MOA was to establish that the Maritime Administration would defend and pursue claims on behalf of the municipality of Anchorage. There was testimony on that at trial from Colonel Vicalis. That money was then subsequently paid to the contractor. That claim was for work that was performed, pursuant to the procurement contract, the 2003 and 2008 ICRC contracts. It was award fee dollars that the government originally said, we're not paying you because you've defectively performed your work. You're not entitled to these dollars. And instead, it took the money that was transferred to it by the municipality and used that to settle the claim, paying a contractor for defective work. It's all part and parcel of the same bucket of damages. It is money that was earmarked for the purpose of constructing a port that was used to pay for defective work. And we're entitled to recover it under an expectancy theory. For breach of which of the two agreements? For breach of the 2011 MOA. But even if... I think I understood, maybe I misunderstood, government counsel to say that if we conclude that there was indeed a breach of the 2011, that they have no further objection to the $11.3 million damage. And I'll rest my case on that. Because there's clearly a breach here. The judge, in its well-reasoned opinion, found that there was a clear breach of the 2011 MOA because there was a duty on the part of the Maritime Administration to assert and defend claims on behalf of the municipality. The parties had entered into a joint defense agreement. The parties understood that was a requirement under the contract, and the mayor had breached that obligation. And I see, over my time, I apologize. Thank you. Thank you, Your Honors. I just want to cover two points on our model. One, I want to make sure our position is as clear as it can be on the various damages theories. Because I think that is particularly relevant to whether a remand is ultimately necessary if the court reverses the trial court's plain language interpretation. Expectation damages were focused on the value of the port structure. And footnote 7 that was pointed to in the last argument doesn't say anything otherwise. It says the alternative theory was the reliance theory. So expectation was just about the value of the port structure. There was no expectation damages presentation about any other breach. There was no approximate cause analysis, no nexus connection between perhaps management decisions and particular actions and damages that flowed from there. So expectations is just about the value of the port structure. And so if the court reverses that interpretation of the MOU, then there is no expectations damages theory that is left. There might be a reliance. There might be a reliance. And as Your Honor suggested, we presented our argument in our briefing about why there is no reliance damages that could be awardable here under the undisputed facts. And that is the fact that Anchorage contributed $163 million to the project. That was their initial contribution. As a consequence of that contribution, they received $117 million in assets, $19.35 million through the settlement with ICRC, and $91 million in reimbursement from the state. That exceeds their contribution. That's the end of the reliance analysis. And I'll just note that Judge Damage, in the opinion on damages, when he was discussing Indiana-Michigan and total breach, that's an expectation damages case. Spent nuclear fuel damages are expectation damages. The rule is different in reliance damages, as West Fed expressly said, which is in a reliance damages case, you can't recover future damages not incurred like you can in an expectations case. And in West Fed, those were binding financial obligations that simply hadn't been liquidated yet. And even still, the court said it's not actually spent. It's not included in reliance. They gave out some new stock when they didn't pay the interest on the old stuff. That's right, Your Honor. And so even binding financial commitments that come due after a period of time are not actually incurred and can't be included in reliance damages. The only other point I wanted to make, Your Honors, is I want to resist the framing that I think infects a lot of Anchorage's theory overall, which is the MOU is not a procurement contract. Anchorage was not procuring services from the government. Congress instructed MERAD to execute this project. MERAD, as a government agency, executed a procurement contract with a contractor. Ordinary agency activity. Anchorage. That's with ICRC. With ICRC. Anchorage, as a local government, had a role, as many local governments do. And if the court is going to imply into this MOU a promise by the government to the local government that the project will be successfully completed, that would have substantial impacts in all of the work the government does on a day-to-day basis. Thank you, Your Honors. Thank you. Thanks to all counsel. The case is submitted.